# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

MICHAEL SHIELDS,                                   Case No. 1:20-cv-02348

                               Plaintiff,

        -vs-                                        JUDGE PAMELA A. BARKER

SMC CORPORATION OF AMERICA, et     MEMORANDUM OPINION & ORDER
al.,

                               Defendants.

Currently pending is Defendants SMC Corporation of America's and Eric Lundgren's Motion for Summary Judgment.  (Doc. No. 28.)  Plaintiff Michael Shields filed a Brief in Opposition to Defendants' Motion, to which Defendants replied.  (Doc. Nos. 30, 32.)  For the following reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.    Background

Defendant SMC Corporation of America ("SMC") manufactures pneumatic and instrumentation components, which are used in factory automation.  (Bruschi Depo., Doc. No. 28-3, PageID# 219-20.)  SMC maintains a sales force that sells SMC's components to customers for use in customers' own factories.  (*Id.*)  SMC's headquarters are in Noblesville, Indiana, but it also maintains branch offices across the country, including in Cleveland, Ohio.  (*Id.*)

Plaintiff Michael Shields began working for SMC as a Sales Representative in SMC's Cleveland branch in January 2005.  (Shields Depo., Doc. No. 28-4, PageID# 231.)  Shields remained at SMC until December 2011, when he became director of sales for a company called Panel Master.  (*Id.*)  Two years later, however, Shields decided to return to SMC.  (*Id.* at PageID# 232.)  At 60 years old, Shields was rehired by Dewayne Bruschi, SMC's Global "GTAP," or Global Target Account,

Group Leader in December 2013.  (*Id.*)  Bruschi remained Shields's direct supervisor until around 2016.  (Doc. No. 28-3, PageID# 223.)

### A.      Shields's Role at SMC

Upon Shields's return in 2013, he became an account manager within the "global target account group," or "GTAP" group.  (*Id.* at PageID# 232.)  SMC's GTAP group focuses on corporate accounts, i.e., large regional, national, and/or international corporate clients with geographically diverse manufacturing environments.  (*See* Bruschi Decl., Doc. No. 28-10, ¶ 3.)  Around April 2019, SMC restructured its sales roles and Shield's title changed to "Corporate Account Manager".  (Doc. No. 28-3, PageID# 222.)  As both an Account Manager and a Corporate Account Manager, Shields was responsible for encouraging large national and international corporations to design their factories with SMC components and/or approve SMC as a "preferred supplier."  (Doc. No. 28-3, PageID# 235.)  The long-term goals of a Corporate Account Manager include achieving "preferred vendor status" and/or "product specification," meaning a customer agreed to design and build its factory machines with SMC-specific components.  (Bruschi Depo., Doc. No. 30-4, PageID# 547.)  It can take a Corporate Account Manager more than a year to achieve these goals.  (*Id.*)  Shields worked on a variety of corporate accounts during his time at SMC, including Proctor & Gamble through 2017, as well as Nordson, Nestle, Cooper Tire, Smucker's, Owens Illinois, Sherwin-Williams, Cardinal Health, and Kroger.  (*Id.* at PageID# 562.)

Shields had several direct supervisors during his second stint at SMC.  He reported to Bruschi from 2013 through 2016.  He then reported to David Armstrong, SMC's Industry Sales Manager for the GTAP group, from 2016 through 2019.  (Armstrong Depo., Doc. No. 28-6, PageID# 257-58.)  When Shields's title changed to Corporate Account Manager in 2019, Shields began reporting

directly to Bill Dawson, the Cleveland branch manager. (Doc. No. 28-3, PageID# 222.) Though Dawson became Shields's direct supervisor in 2019, Bruschi and Armstrong maintained "dotted line" reporting over Shields. (*Id.* at PageID# 222-23.) This meant that Dawson oversaw Shields's day-to-day activities, expenses, timesheets, and the like, while Bruschi and Armstrong oversaw Shields's overall strategy and provided any support Shields needed with his customers (e.g., supporting Shields during preferred vendor agreement contract negotiations). (*Id.*) After Dawson left SMC in January 2020, Cleveland's branch personnel, including Shields, began reporting on an interim basis to Eric Lundgren, SMC's Central Regional Manager. (Lundgren Depo., Doc. No. 28-5, PageID# 251.)

Shields was not the only Corporate Account Manager in SMC's Cleveland branch. Another employee, Mark Thompson, also worked as a Corporate Account Manager in Cleveland until his retirement sometime in 2019. (Dawson Depo., Doc. No. 30-7, PageID# 652.) After Thompson retired, Shields covered both his and Thompson's accounts. (Dawson Depo., Doc. No. 30-7, PageID# 652.) Indeed, under "Accomplishments" on Shields's 2019 performance review, Dawson commended Shields for "doing the job of two corporate account managers since his partner retired." (Doc. No. 30-1, PageID# 442.)

In late 2019, SMC moved to fill the Corporate Account Manager position vacated by Thompson in Cleveland. On October 24, 2019, Dawson contacted SMC's human resources department, indicating that he wished to hire 34-year-old David Williams as a Corporate Account Manager. (Doc. No. 30-1, PageID# 516.) Dawson indicated that Williams would oversee the Nordson, Goodyear, Eaton, Whirlpool, and Cooper Tire accounts. (*Id.*) According to Williams's application, he had prior experience as a sales manager at various companies in Northeast Ohio but did not indicate that he held any "Certifications/Special Qualifications," nor that he had expertise in

a specific industry, e.g., the tire industry.  (*Id.* at PageID# 513-14.)  SMC offered Williams the Corporate Account Manager position on October 31, 2019.  (*Id.* at PageID# 517.)  Williams began as an SMC Corporate Account Manager on November 18, 2019.  (Doc. No. 30-1, PageID# 511; *see also* Doc. No. 30-7, PageID# 655-57.)  Per SMC's policy, Williams was placed on a 90-day introductory period, which lasted through February 2020.  (Lundgren Depo., Doc. No. 30-8, PageID# 687.)

### B.    Shields's Performance at SMC

Shields appears to have been largely successful during his tenure at SMC.  For example, shortly after Shields was assigned the Proctor & Gamble account in 2013, he helped SMC achieve "specification status" with Proctor & Gamble.  (Doc. No. 30-4, PageID# 557.)  In another example, an undated internal SMC "Success Story" touted a successful recommendation that Shields made on a product specification for Nestle.  (Doc. No. 30-1, PageID# 445.)  According to the handout, the "engineers and design staff are very happy with Mike's recommendations and are eagerly awaiting the end-user's feedback to begin on building more machines for subsequent orders.  Great job to Mike!"  (*Id.*)  Additionally, according to Armstrong, Shields also worked on securing a preferred supplier agreement with Nestle sometime around 2019.  (Armstrong Depo., Doc. No. 30-6, PageID# 636-37, "[Y]es, Mike would have been working for the U.S. side as part of that agreement.")

Only Shields's final annual performance review, dated from December 1, 2018 through December 31, 2019, was produced by SMC in this matter.[1]  Dawson completed this annual performance review, assisted by Armstrong, who offered Dawson additional input and development goals to be included in Shields's review.  (Armstrong Depo., Doc. No. 30-6, PageID# 634.)  Dawson

---

[1] SMC claims that it lost all performance reviews dated prior to 2019 when SMC switched to a new human resources software system.

assessed Shields's performance on a scale of 1 to 4 in 20 areas, including operational process understanding, creativity and ability to create sales, executing company direction, productivity, and communication.  (Doc. No. 30-1, PageID# 438-44.)  Shields received an overall score of 2.85, or "fully meets expectations."  (*Id.*)  Under the "Accomplishments" section, Dawson noted that Shields had "been doing the job of two corporate account managers since his partner retired."  (*Id.*)  At Armstrong's suggestion, Dawson wrote in the "Overall Comments" section that "Mike continues to work well with fellow SMC personnel and is a team player when called upon."  (*Id.*; *see also* Doc. No. 30-6, PageID# 634.)  Dawson noted Shields's professionalism with colleagues and customers, but also noted that Shields needed to "coordinate more with end-user Account Reps. in order to be successful at the CA's [corporate accounts] he is targeting."  (*Id.*)  Dawson suggested that Shields increase his activity with regular plant updates and visits.  (*Id.*)  Dawson concluded that, "[o]verall, [Shields] is a valued member of the team.  I recommend a 3% merit increase."  (*Id.*)

## C.    SMC's April 2020 Reduction-in-Force

In Spring 2020, the burgeoning COVID-19 pandemic began disrupting global manufacturing, including at SMC.  On April 1, 2020, SMC's National Sales Manager, Scott McCambridge, sent an email to Bruschi, among other SMC executives, titled "CONFIDENTIAL – Information needed by the end of the day tomorrow!!!"  In his email, McCambridge wrote:

> Hey guys, I hate to send this communication, but as you know our incoming is starting to tank.  We need to prepare for the worst to come… This is not just the sales division, but Kelley has requested this of the entire company.  At this point, we just need the list and this communication is not to be communicated with anyone lower than the Branch Managers.
> By the end of the day tomorrow, I need a list of names from each of you listing the headcount you can do without moving forward. You can just reply directly to me.
>
> I know most of you do not have people to add to the list, but I wanted to give you the opportunity.

5

(Doc. No. 30-1, PageID# 446-47.)

Shortly thereafter, McCambridge sent a similar email to Lundgren, among other regional managers. This second email read in relevant part as follows:

> Hey guys, I hate to send this communication, but as you know our incoming is starting to tank. We need to prepare for the worst to come… This is not just the sales division, but Kelley has requested this of the entire company. At this point, we just need the list and this communication is not to be communicated with anyone lower than the Branch Managers. They need to make the decisions, not the Sales Managers.
>
> By the end of the day tomorrow, I need a spreadsheet from each of you by branch listing the headcount they can do without moving forward. This needs to be an honest list and a list that is the fairest to the company and to the branch. **There is no set number, but I can assure you that you do not want HQ picking people for you based on performance or sales numbers…**
>
> . . .

(*Id.* at PageID# 525, emphasis added.)

Bruschi responded to McCambridge's email a few hours later. Bruschi wrote that with respect to his *own* team, "they have deep experience and deep customer relationships, very hard to ever replace." (*Id.* at PageID# 446.) However, Bruschi suggested several names from other teams, including Shields. Bruschi wrote as follows:

> Looking at the CAM's, [*sic*] I feel that we could potentially do without **Michael Shields**. He does not report to me anymore just my and Dave Armstrong feeling. [*sic*] I have not talked to Dave specifically about this but I know this is how he feels.

(*Id.*, emphasis in original.)

Lundgren responded to McCambridge's email twice. Soon after he received McCambridge's email, Lundgren notified McCambridge that he would be "cautious with this, we have gotten rid of 2 non performers [*sic*] in Cleveland, one last week and one in January, I will have at least 1 more to add to the list for this Branch." (*Id.* at PageID# 524.) The next day, on April 2, 2020, Lundgren sent

6

McCambridge a chart with 13 names, including that of Tom Landers, a Business Development

Account Manager in the Cleveland office.  (*Id.* at PageID# 527.)  Lundgren included comments for

each of the 13 individuals he suggested could be terminated in the reduction-in-force.  (*Id.*)  Lundgren

noted things such as whether an individual's sales were low, whether the individual was on a

performance improvement plan, and whether the individual had a poor reputation with customers.

(*Id.*)  For example, Lundgren wrote that Landers "[had] not met the metrics of Business Development

Account manager for FY19."  (*Id.*)  Lundgren did not include Shields on his list.  (*Id.*)

> McCambridge responded to Lundgren's second email as follows:
>
> Just to verify… No one from Cincy?  Also, Dewayne put Mike Shields on his list, but obviously noted that he does not report to him.  Dave Armstrong and Dewayne both feel Mike brings no val[u]e… Just let me know. Thanks.

(*Id.* at PageID# 528.)  Lundgren replied shortly thereafter, asking McCambridge to give him a call

because he wanted to discuss McCambridge's email.  (*Id.*)

According to Lundgren, he told McCambridge on the phone that he "didn't have enough

information to put Mr. Shields on the list, because [he] really had no active reporting or direct

reporting to [Lundgren] . . . so [he] did not have enough information at that point to add him to the

list."  (Doc. No. 28-5, PageID# 254.)  However, Lundgren also told McCambridge that while he

didn't "have enough information to put [Shields] on the list," he "trust[ed] Mike and Dave Armstrong

in their judgment."  (*Id.*)  Lundgren claims that he had no further conversations, either with Bruschi

or anyone else,[2] about terminating Shields's employment after his April 2, 2020 call with

McCambridge.  (*Id.*)

---

[2] In Defendants' initial responses to Shields's interrogatories, Defendants asserted that "Dewayne Bruschi and Eric Lundgren held a meeting on April 3, 2020 and made the decision to terminate Plaintiff's employment."  (*See* Doc. No. 30-1, PageID# 421.)  However, during depositions, both Lundgren and Bruschi testified that no such meeting occurred. (*See* Doc. No. 28-5, PageID# 254; Doc. No. 30-4, PageID# 582.)

On April 10, 2020, Lundgren notified Shields that his employment with SMC was terminated due to the COVID-19-related reduction-in-force.  (Doc. No. 28-5, PageID# 254-55.)  Shields was 66 years old at the time of his termination.  (Doc. No. 30-1, PageID# 470.)  Shields became upset and asked Lundgren if his termination was age-related.  (Doc. No. 28-5, PageID# 254-55.)  Lundgren refused to answer the question and told Shields that he should contact HR.  (*Id.*)  SMC offered Shields a severance agreement, which provided for two weeks' salary.  (Doc. No. 28-8, PageID# 323.)  Shields declined the severance package, believing it was not substantial enough and that he was owed more severance than two weeks' pay after 13 years of employment with SMC.  (Shields Depo., Doc. No. 28-4, PageID# 246.)

Ultimately, SMC laid off 127 employees from multiple divisions across the country.  (Castille Decl., Doc. No. 28-11, ¶ 3.)  The salesforce that remained at SMC received an across-the-board 20 percent reduction in pay and commensurate reduction in hours.  (Doc. No. 28-5, PageID# 255.)  Williams, the other Cleveland-based Corporate Account Manager, was not terminated in the April 2020 layoffs.  (Doc. No. 28-5, PageID# 254.)  According to Lundgren, Williams's direct supervisor, he did not consider selecting Williams for termination, even though Williams had only just completed his 90-day introductory period and had no performance reviews as of April 2020.  (*Id.*)  Likewise, Bruschi did not consider laying off Williams.  (Doc. No. 28-3, PageID# 227.)

On June 30, 2020, Shields's attorney sent SMC a demand letter, outlining Shields's potential claims of age discrimination.  (Doc. No. 30-4, PageID# 584.)  A few weeks later, on July 16, 2020, Bruschi sent McCambridge and other SMC executives an email titled "CAM Analysis-Mike Shields." (Doc. No. 30-1, PageID# 448.)  In his July 16, 2020 email, Bruschi set out, for the first time, an analysis of Shields's performance and compared Shields's performance to four other senior Corporate

Account Managers to justify terminating Shields's employment.  (*Id.*)  According to Bruschi, it was "very obvious that Mike was not measuring up."  (*Id.*)  Bruschi did not compare Shields's performance to Williams's.  (*Id.*)

### D.   Procedural History

Shields filed this matter on September 9, 2020 in the Cuyahoga County Court of Common Pleas.  (Doc. No. 1-3.)  Defendants removed the matter to this Court on October 10, 2020.  (Doc. No. 1.)  On January 18, 2021, Shields filed his First Amended Complaint, asserting two claims against SMC and Lundgren, unlawful age discrimination in contravention of Ohio Rev. C. § 4112.02 and unlawful age discrimination in contravention of the Age Discrimination in Employment Act ("ADEA") under 28 U.S.C. § 621, *et seq.*  (Doc. No. 15, ¶¶ 26-41.)

On November 19, 2021, Defendants filed a Motion for Summary Judgment.  (Doc. No. 28.)  On December 20, 2021, Shields filed a Brief in Opposition to Defendants' Motion, to which Defendants replied on January 10, 2022.  (Doc. Nos. 30, 32.)  Thus, Defendants' Motion is now ripe for a decision.

## II.   Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.,* 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc*., 593 Fed. Appx 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp*., 295 Fed. Appx 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems*., 593 Fed. Appx at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc*., 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox,* 53 F.3d at 150).

## III.    Analysis

In Counts One and Two, Shields alleges that SMC and Lundgren discriminated against him on the basis of age when it terminated his employment on April 10, 2020, in violation of the ADEA, 29 U.S.C. § 621, *et seq*, and Ohio law.  (Doc. No. 15 at ¶¶ 26-41.)  Defendants argue that they are

10

entitled to summary judgment in their favor with respect to both claims, asserting that the record establishes that there is no direct, circumstantial, or statistical evidence suggesting SMC discharged Shields because of his age when he was selected for the reduction-in-force due to his lackluster job performance. (Doc. No. 28, PageID# 178.) Moreover, Defendants argue that Shields's individual claims against Lundgren fail because the ADEA does not permit employees to assert age discrimination claims against individual supervisors, and Lundgren otherwise committed no discriminatory conduct upon which Shields could base a state-law claim of age discrimination. (*Id.* at PageID# 179.) The Court will first analyze Shields's claims against SMC before turning to Shields's individual claims against his former supervisor Lundgren.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge . . . or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Ohio Rev. Code § 4112.02, provides that it shall be an unlawful discriminatory practice "[f]or any employer, because of the … age . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). Age discrimination claims brought under Ohio law "are 'analyzed under the same standards as federal claims brought under the [ADEA].'" *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Wharton v. Gorman–Rupp Co*., 309 Fed. Appx. 990, 995 (6th Cir.2009)).

"An employee can establish an age discrimination case by either direct or circumstantial evidence." *Martin v. Toledo Cardiology Consultants, Inc*., 548 F.3d 405, 410 (6th Cir. 2008). Here,

Shields relies on circumstantial evidence of age discrimination.  ADEA claims relying on indirect evidence of age discrimination are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020); *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014).  As discussed *supra*, under that framework, the plaintiff must first produce "evidence from which a reasonable jury could conclude that he or she established a *prima facie* case of discrimination" before the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action.  *See Willard,* 952 F.3d at 807.  The plaintiff must then rebut the proffered reason by producing "evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id*.  *See also Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802.)  As the Sixth Circuit recently explained:

> As we have clarified before, the *McDonnell Douglas* burden-shifting framework allocates "the burden of production and [provides] an order for the presentation of proof in [employment discrimination] cases." *Provenzano*, 663 F.3d at 812 (last alteration in original) (emphasis added) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000)). Thus, at the first stage of the burden-shifting framework, we do not ask whether a jury could conclude that the plaintiff has proven its *prima facie* case by preponderant evidence, but rather whether "a reasonable jury could conclude that a *prima facie* case of discrimination has been established." *Provenzano,* 663 F.3d at 812 (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)).  At the pretext stage, the plaintiff's burden of production "merges" with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination. *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

*Willard*, 952 F.3d at 807.

Ordinarily, to establish a *prima facie* case of age discrimination, a plaintiff must show that (1) he was a member of a protected class (older than 40 years old); (2) he suffered an adverse employment action; (3) he was qualified for the position held; and (4) he was replaced by someone outside of the

12

protected class or similarly situated non-protected employees were treated more favorably.  *See Pelcha v. MW Bancorp., Inc.,* 988 F.3d 318, 326 (6th Cir. 2021); *Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009).  However, in the context of a reduction-in-force case, such as this one, the typical *prima facie* standard "would allow *every* protected employee discharged in the reduction to establish a prima facie case—and the consequent 'legally mandatory, rebuttable presumption that the defendant discriminated' against her."  *Siegel v. Inverness Med. Innovations, Inc.*, No. 1:09-CV-01791, 2010 WL 1957464, at *2 (N.D. Ohio May 14, 2010) (quoting *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1464 n. 7, 1465 (6th Cir.1990)).  Thus, "[i]f the termination arises as part of a work force reduction, this court has modified the fourth element to require the plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'"  *Geiger*, 579 F.3d at 623 (quoting *Barnes*, 896 F.2d at 1465).

A.      **Shields's *Prima Facie* Case**

The parties agree that the first three elements of Shield's *prima facie* case are satisfied. Shields was a member of the protected class because he was over the age of 40, and his termination constitutes an adverse employment action.  Further, SMC does not contest that Shields was qualified for the position of Corporate Account Manager.  (*See* Doc. No. 28-1, PageID# 200.)  Thus, the only issue is whether Shields has satisfied the fourth prong, i.e., whether he can provide additional direct, circumstantial, or statistical evidence tending to indicate that SMC singled Shields out for discharge for impermissible reasons.  *Geiger*, 579 F.3d at 624.

According to the Sixth Circuit, this modified *prima facie* standard is not meant to "create[ ] an undue hardship for age discrimination plaintiffs who are eliminated as part of a work force

reduction." *Barnes*, 896 F.2d at 1465. "For example, a plaintiff could establish a prima facie case by showing that he or she possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff." *Id.* at 1466. "The guiding principle is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age." *Id.*

The Court concludes that Shields has established the fourth prong of his *prima facie* case. Shields presents additional circumstantial evidence that though he possessed qualifications superior to those of Williams, a significantly younger co-worker who worked in the same position as Shields, Williams was nevertheless retained, and Shields was laid off.[3]  Although Williams had only just completed his 90-day introductory period and had no real experience as a Corporate Account Manager, neither Bruschi nor Lundgren considered including Williams in the reduction-in-force. (*See* Doc. No. 28-3, PageID# 227, Bruschi testified that he "did not" consider Williams for layoff or termination; Doc. No. 28-5, PageID# 254-55, Lundgren testified that he never considered terminating Williams's employment in the April 2020 layoffs.)  Shields had significantly more experience managing corporate sales accounts than Williams.  Shields worked in sales for SMC for a total of 13 years, from 2005 to 2011, and then from 2013 through 2020, when he was laid off.  (Doc. No. 30-5, PageID# 604-05.)  During his two years away from SMC, he worked as director of sales at a regional company, Panel Master.  (*Id.*)  During his second stint at SMC, Shields handled a variety of corporate

---

[3] Although discriminatory remarks can be direct evidence of age discrimination, the Sixth Circuit is clear that "[a]n isolated discriminatory remark made by [a speaker] with no managerial authority over the challenged personnel decisions is not considered indicative of age discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). Shields contends that other SMC employees referred to him as "Uncle Mike," "Pops," and "the old guy," which demonstrated that SMC's culture was shifting towards hiring younger workers. Shields does not contend that any of his direct supervisors made such comments, that the speakers held any managerial authority over him, or that they participated in the decision to include Shields in the reduction-in-force. Thus, the Court disagrees with Shields that these isolated comments are indicative of age discrimination.

14

accounts over the course of seven years, including Proctor & Gamble, where he helped to secure a preferred supplier agreement. (*Id.* at PageID# 607.) Shields also had a demonstrated record of success at SMC, as evidenced by the undated internal "Success Story" circulated within SMC as well as Shields's 2019 performance review, in which he was described as "a valued member of the team." (Doc. No. 30-1, PageID# 443-45.) Moreover, prior to his time at SMC, Shields owned his own business for 21 years. (Doc. No. 30-5, PageID# 603.) Dawson commented on Shields's decades' worth of experience running his own business in Shields's 2019 performance review. (Doc. No. 30-1, PageID# 441.) Dawson noted that this experience indicated that Shields was capable of taking on positions of greater responsibility within SMC if Shields wished. (*Id.*)

Conversely, Williams had just four years of account manager experience, and four years of sales manager experience prior to joining SMC. (Doc. No. 30-1, PageID# 515.) According to Williams's resume and SMC application, Williams had no expertise in any specific industry, nor had Williams apparently handled large national or international corporate accounts. (*Id.* at PageID# 513-15.) Further, Williams had only just completed his 90-day introductory period at the end of February 2020 and had just worked as a full employee at SMC for a little over a month before the reduction-in-force occurred. (Doc. No. 30-4, PageID# 569-70.) Williams had no demonstrated record of success as an SMC Corporate Account Manager, nor any reviews of his performance, at the time of the reduction-in-force. Indeed, Williams's first performance review was completed on May 5, 2020 and covered the period from March 1, 2020 – April 17, 2020. (Doc. No. 30-1, PageID# 506.) According to Williams's evaluation, he spent this period "learning different aspects of SMC," completing training modules, "[p]articipat[ing] in Holon meetings to gain better understanding of daily operational procedures," and watching online videos on product development and design

15

improvements. (*Id.*) Williams's goals included spending time in factories to better learn SMC's products and assembly practices, attending customer lunch-and-learn meetings with sales representatives, and attending one-on-one training with business development and application specialists. (*Id.* at PageID# 507.) Lundgren wrote that in the four months since joining SMC, Williams assisted other SMC Corporate Account Managers organize their accounts and map activity to gain "deep insight" into plant operations, leveraged his previous distributor contacts for key information for the Cleveland branch, and gave "new insight" to the Cleveland branch on "new direction on strategy for corporate accounts." (*Id.*) In other words, according to Williams's May 5, 2020 review, he was still learning the job and SMC's procedures, completed several training assignments, and helped other Corporate Account Managers organize their sales accounts. Nothing in Williams's review indicates that he had yet progressed to working on securing preferred vendor contracts or spec agreements with his national or international corporate clients, as Shields had been doing immediately prior to his termination. Thus, Shields has demonstrated that he possessed qualifications superior to those of Williams, a far younger co-worker who was retained in the April 2020 reduction-in-force. Therefore, Shields has established the fourth prong of his *prima facie* case. *See Barnes*, 896 F.2d at 1466; *see also, e.g., Merritt v. FirstEnergy Corp.*, No. 1:05-cv-00586, 2007 WL 1544578, at *5 (N.D. Ohio May 24, 2007) (concluding that the plaintiff satisfied the modified fourth prong of his *prima facie* case in a reduction-in-force case by demonstrating that his qualifications as a claims processor were superior to two younger, retained employees, at least with respect to processing of claims); *cf. Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 267 (6th Cir. 2010) (concluding the plaintiff failed to establish the modified fourth prong of her *prima facie* case in a reduction-in-force case because while she demonstrated that younger employees were

16

retained and she was not, she failed to demonstrate that she possessed qualifications superior to those of the younger, retained employees).

Defendants' various arguments regarding Shields's *prima facie* case are unpersuasive. First, Defendants' attempt to paint Shields's comparison to Williams as Shields mistakenly attempting to satisfy the lower "similarly situated comparator" analysis prong (which is inapplicable in a reduction-in-force case) is unpersuasive. (Doc. No. 28-1, PageID# 205-09.) Under Sixth Circuit precedent, Shields may attempt to establish the modified fourth prong by offering additional circumstantial evidence that he possesses qualifications superior to those of a younger co-worker who was retained in the same position. *See supra.* Shields has demonstrated that he possessed superior qualifications to Williams. Under Sixth Circuit precedent, this is sufficient to satisfy the modified fourth prong of the *prima facie* case. *Barnes*, 896 F.2d at 1466. Likewise, while the overall statistics from SMC's April 2020 reduction-in-force do not demonstrate any disparities in relation to the ages of those affected, statistical evidence is just *one* way a plaintiff may establish the modified fourth prong of his *prima facie* case. *Id.* at 1465 (a plaintiff must present "additional direct, circumstantial, _or_ statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons") (emphasis added).

Additionally, the Court rejects Defendants' various reasons why Shields should not be compared to Williams. For example, Defendants argue that Bruschi only considered terminating GTAP-affiliated Corporate Account Managers with whom he was familiar. (Doc. No. 28-1, PageID# 207; Doc. No.28-3, PageID# 229-30.) According to Bruschi, he had no knowledge of Williams's work performance and could not recommend whether to terminate Williams's employment because Williams never reported to him. (*Id.*) However, the record indicates that Williams *was* a GTAP-

17

affiliated Corporate Account Manager. Though Bruschi claims that, "in [his] understanding, Dave Williams was performing as an industry specialist," the record is clear that Williams only worked as a Corporate Account Manager and never as an Industry Specialist.[4] (*See* Doc. No. 30-1, PageID# 505, 511-19.) Williams applied for the Corporate Account Manager position. (*Id.*) Dawson requested permission to offer Williams the position of Corporate Account Manager. (*Id.*) Williams's October 31, 2019 offer letter indicates that SMC is offering him the position of Corporate Account Manager. (*Id.*) Williams's onboarding checklist indicates that he is a Corporate Account Manager, as does Williams's July 2020 letter of resignation to SMC and Lundgren's email to human resources indicating that Williams was resigning from his Corporate Account Manager position. (*Id.*) Further, Defendants amended their interrogatory responses to clarify that Williams was indeed a Corporate Account Manager, not an Industry Specialist as they initially asserted. Defendants claimed that though Williams's "position classification" was changed in SMC's computer system on April 1, 2020, "his job duties and reporting structure remained the same for the duration of his employment." (Doc. No. 30-3, PageID# 539-40.) According to the Corporate Account Manager job description, Corporate Account Managers report to the branch manager, as well as the industry sales manager and the global industry manager—i.e., Bruschi. (Doc. No. 30-1, PageID# 505.) Thus, based on Williams's role as Corporate Account Manager, Bruschi would have had "dotted line" supervisory duty over Williams—just like he had over Shields, another Corporate Account Manager. Rather, it appears that Bruschi never took the time to evaluate *all* GTAP Corporate Account Managers for

---

[4] Industry Specialists and Corporate Account Managers are different roles at SMC. Each role is subject to different Key Performance Indicators (KPIs) and Industry Specialists focus exclusively on accounts within one specific industry while Corporate Account Managers may handle accounts across multiple industries. (Doc. No. 30-4, PageID# 546-47.)

potential layoff, but quickly suggested Shields, a highly experienced Corporate Account Manager, instead.

Likewise, Defendants' assertion that Williams is not the correct comparator because Bruschi had only met Williams once and Williams was so new that he had yet to receive a performance review is also unpersuasive.  (Doc. No. 28-1, PageID# 207.)  Bruschi clearly considered other employees' hire dates in making his recommendations for termination to McCambridge.  In his April 1, 2020 email to McCambridge, Bruschi identified two Energy Group employees who could be terminated. Bruschi wrote as follows:

> Stefani Bendicion—could be terminated. 8/12/2019 hire date.
> Jeffery Wilhite—could be terminated. 8/12/2019 hire date.

(Doc. No. 30-1, PageID# 446.)  Bruschi offered no further justification for their terminations, other than their relatively recent hire dates.  Thus, Bruschi considered at least two SMC employees fit for termination apparently based on start date alone.  There is no indication why Bruschi did not do the same with respect to Williams, whose November 2019 start date was even more recent than the energy employees' August 2019 start dates, and instead recommended Shields, the more experienced, qualified Corporate Account Manager, for layoff instead.

Additionally, the Court rejects Defendants' argument that Williams's lack of a performance review in April 2020 bolsters their argument that Williams is an inappropriate comparator to Shields. Actually, this point seriously undermines their argument.  As discussed *supra*, Shields's 2019 performance review was generally positive, resulted in Shields receiving a 3% merit raise, and indicated that he was a valued member of the team (per the comments that **Armstrong** suggested be added to Shields's review).  (*See* Doc. No. 30-1, PageID# 438-44; Doc. No. 30-6, PageID# 634-35.) Defendants had *no* information about Williams's performance at SMC because he had only just been

19

hired. (Doc. No. 30-8, PageID# 720-23, Lundgren testified that he met with Williams around March 10, 2020 to conduct Williams's "green"—i.e., new hire—review.) It is illogical that Bruschi and Lundgren, when faced with the immediate and significant economic downturn prompted by the COVID-19 pandemic, chose to terminate a highly experienced employee over Williams, who had no proven record of success (or failure) at SMC, and was an unknown quantity as a Corporate Account Manager. Shields cost SMC little more than Williams (the difference between their salaries was approximately $12,000) yet possessed superior qualifications that may have helped SMC weather the economic downturn caused by COVID-19. (*See* Doc. No. 30-5, PageID# 609, Shields's salary at time of termination was approximately $85,000; Doc. No. 30-1, PageID# 517, Williams's starting salary was $73,500.) The fact that Shields had superior qualifications to Williams but was instead included in the reduction-in-force creates an inference that Shields was singled out for discharge for impermissible reasons. *See Chavez v. Dakkota Integrated Sys., LLC, et al.*, 832 F. Supp. 2d 786, 797 (W.D. Ky. 2011) (concluding that the fact that the plaintiff had superior qualifications to non-protected class members but was nevertheless laid off in a reduction-in-force created an inference that he was singled out for discharge for impermissible reasons).

Moreover, there is evidence that Bruschi was unaware of Shields's performance as of April 2020. Though Defendants maintain that Bruschi had "dotted line" supervisory responsibility over Shields, Bruschi wrote to McCambridge that: " . . . I feel that we could potentially do without Michael Shields. **He does not report to me anymore just my and Dave Armstrong feeling.** [*sic*] **I have not talked to Dave specifically about this** but I know this is how he feels." (Doc. No. 30-1, PageID# 446, emphasis added.) Further, Bruschi admitted that he did not review Shields's 2019 performance review, and that he did not have access to Shields's performance review, before recommending to

McCambridge that Shields be included in the reduction-in-force.  (Doc. No. 30-4, PageID# 572.)  In other words, Bruschi recommended that an employee who no longer reported to him be terminated based on his and Armstrong's "feeling"—even though Bruschi *did not speak to Armstrong* before making his suggestion on both of their behalf.  The record indicates that Bruschi had little more evidence about Shields's performance before him than about Williams's performance when he recommended Shields for termination.

Finally, the Court rejects Defendants' argument that Shields's proper comparators are the four senior Corporate Account Managers Bruschi identified in his July 16, 2020 chart.  First, as Defendants correctly noted, the "similarly situated comparator" analysis is irrelevant to a reduction-in-force case.  Thus, it is irrelevant how Shields compares to these four random Corporate Account Managers.  Shield's comparison to Williams is relevant because it demonstrates that Shields, the better-qualified Corporate Account Manager, was included in the reduction-in-force while Williams, the younger, less-qualified Corporate Account Manager, was retained.  This is one way that Shields can establish the fourth prong of his *prima facie* case.  *Barnes*, 896 F.2d at 1466.  Second, based on the record before the Court, Bruschi only decided to compare Shields to these four other Corporate Account Managers in July 2020, well after Bruschi and SMC became aware that Shields planned to bring age discrimination claims against SMC.  (Doc. No. 30-4, PageID# 583.)  There is absolutely no evidence that in April 2020, Bruschi considered Shields's performance relative to that of other Corporate Account Managers, other than Bruschi's own self-serving declaration that he did so.  (Doc. No. 28-10, ¶ 8.)  Bruschi's post-hoc rationalization of his decision to recommend Shields for termination is unpersuasive and conflicts with the record evidence surrounding his April 1, 2020 recommendation.

21

Viewed in the light most favorable to Shields, this evidence would permit a jury to find that SMC chose to terminate Shields, the better-qualified Corporate Account Manager, and retain Williams, the less-qualified Corporate Account Manager, because Shields was significantly older than Williams.  The Court concludes that Shields has satisfied the fourth prong of his *prima facie* case.

### B.    Pretext

The burden then shifts to SMC to articulate a legitimate, non-discriminatory reason for Shields's selection for the reduction-in-force.  *Barnes*, 896 F.2d at 1464 (citing *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).  According to SMC, Shields was selected for the reduction-in-force "based upon his overall performance in connection with a companywide RIF as the result of the downturn in sales due to the COVID-19 pandemic.  SMC arrived at this decision after Bruschi weighed many unbiased metrics and determined Shields was the proper candidate for the reduction due to his performance."  (Doc. No. 28-1, PageID# 209.)

"When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for [his] termination is pretextual."  *Blizzard*, 698 F.3d at 285.  Shields contends that SMC's reasons were pretext for unlawful age discrimination.  (Doc. No. 30, PageID# 413.)  At this stage, Shields "has the burden to produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him].'"  *Id.* (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).  Shields "can accomplish this by proving '(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate [his] [discharge], or (3) that they were *insufficient* to motivate discharge.'"  *Id.* (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir.

2012)).  This "three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'"  *Id.* (quoting *Chen*, 580 F.3d at 400 n. 4).

The Court concludes that there is evidence that Defendants' proffered reasons for terminating Shields's employment did not actually motivate Defendants' actions.  Specifically, Defendants' proffered reasons—including Bruschi's July 16, 2020 chart, the "objective metrics" Bruschi used to compare Shields's performance to that of four random Corporate Account Managers, and the alleged complaints around Shields's handling of the Proctor & Gamble account in 2016[5]—were only created *after* Shields threated Defendants with an age discrimination lawsuit.  (Doc. No. 28-8, PageID# 285-91.)  Indeed, Bruschi admitted that the criteria he included in his July 16, 2020 chart was not memorialized anywhere prior to Shields's termination and that this chart was only produced after he "became aware of the lawsuit."  (Doc. No. 30-4, PageID# 575.)  Other than Bruschi's own self-serving declaration, there is no evidence that Defendants considered any of Bruschi's "objective

---

[5] Defendants' alleged "evidence" of complaints about Shields's performance with respect to the Proctor & Gamble account is particularly weak.  On July 13, 2020, Bruschi sent a "document on China complaint and some info to validate date/timing" to various SMC executives.  (Doc. No. 28-8, PageID# 288.)  Bruschi wrote:

> Liu Laxi [an SMC employee] was pretty critical of Mike Shields verbally to me more than once. Nothing in writing.  At the time, I assured him we would improve the situation.

(*Id.*)  Bruschi forwarded an undated narrative titled "P&G Account Change."  The narrative is similar in appearance to Bruschi's July 2020 email and describes events that occurred in both June 2017 and March 2018, suggesting that the narrative was drafted contemporaneously to Bruschi's July 2020 email.  (*Id.* at PageID# 289.)  Attached to his "P&G Account Change" narrative, Bruschi also forwarded a single July 6, 2016 email from an SMC employee, Vincent Lee, to Shields, in which Lee introduces himself and describes his role on SMC's P&G team.  (*Id.*)  Absolutely nothing in Lee's email indicates that Lee, Liu, or any other SMC or P&G employee expressed *any* dissatisfaction about Shields's performance.  Bruschi sent another email on July 15, 2020 to the same SMC executives supposedly detailing an "SMC Japan complaint," noting that "[a]gain nothing in writing but Ms. Cheun was verbally not happy with Mike."  (*Id.* at PageID# 290.)  Again, Bruschi includes a narrative that appears to have been written in 2020 accompanied by an innocuous email exchange between Shields and SMC Japan employee Keisuke Konishi in which Konishi asks Shields to look into an issue with a document and Shields responds that he would.  (*Id.* at PageID# 291.)  The only "complaints" about Shields's performance in these emails appear to be Bruschi's July 2020 descriptions of complaints he allegedly received in 2016, but with no documentation to indicate that such complaints were indeed raised at that time.

23

metrics" in April 2020.  In his April 1, 2020 email, Bruschi suggests that Shields be included in the reduction-in-force "just" on Bruschi's "feeling" that SMC "could potentially do without Michael Shields."  (*Id.* at PageID# 283.)  Bruschi did not indicate that this feeling was based on any objective metrics or Shields's performance.  Bruschi also acknowledged in his April 1, 2020 email that Shields "does not report to [him] anymore," and he admitted in his deposition that he did not review, or have access to, Shields's 2019 performance review.  (*Id.*; *see also* Doc. No. 30-4, PageID# 572.)  Based on this evidence, there is conflicting evidence that Bruschi was aware in April 2020 of the details and intricacies of Shields's performance that he ultimately set forth in his July 2020 "objective metrics" chart.

Likewise, Lundgren testified at his deposition that he told McCambridge on April 2, 2020 that he "didn't have enough information to put Mr. Shields on the list, because [Lundgren] really had no active reporting or directing reporting" from Shields to him.  (Doc. No. 30-8, PageID# 700.)  Lundgren also admitted that he did not review any documents associated with any Cleveland employees prior to the reduction-in-force, other than for Tom Landers.  (*Id.* at PageID# 702.)  Moreover, though Lundgren circulated a July 13, 2020 email discussing a March 10, 2020 meeting between Lundgren and Shields to discuss Shields's goals and Key Performance Indicators (KPIs), Lundgren testified in his deposition that he did not rely on any of the information he circulated in his July 13, 2020 email when deciding to terminate Shield's employment.  (Doc. No. 30-8, PageID# 135; *see also* Doc. No. 30-1, PageID# 451-56.)  There is no evidence to suggest that Lundgren relied on any "objective metrics" in April 2020 when he accepted Bruschi's suggestion that Shields be fired.

Indeed, there is ample evidence to suggest that, contrary to Defendants' proffered rationale for terminating Shields's employment, Defendants' April 2020 decision to terminate Shields's

24

employment was not actually motivated by Shields's "overall performance," or based on "many unbiased metrics." (Doc. No. 28-1, PageID# 209.) Neither Bruschi nor Lundgren reviewed Shields's 2019 performance review, or any other documents, prior to Shields's termination. The April 2020 emails contain no discussion of details about whether Shields was meeting expectations as of April 2020. Further, there is no evidence to suggest that, as of April 2020, Lundgren or Bruschi considered whether Shields met any of the "unbiased metrics" that Bruschi eventually set out in his July 16, 2020 chart. Thus, it is clear to the Court that Defendants' proffered reason could not have motivated Defendants' April 2020 decision to terminate Shields's employment because Defendants only created their reason in July 2020, after Defendants became aware of Shields's lawsuit.

The "honest belief" rule does nothing to help Defendants here. Defendants claim that Bruschi and Lundgren "honestly believed they made the correct, unbiased decision based on the evidence they had at the time" and argue, therefore, that even if their evaluations were incorrect, "the 'honest belief' rule defeats any argument in favor of pretext." (Doc. No. 28-1, PageID# 210-11.) Not so. Under the honest belief rule,

> "[w]hen an employer reasonably and honestly **relies on particularized facts** in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir.2009) (internal quotation marks omitted). "An employer's *pre*-**termination investigation** need not be perfect in order to pass muster under the rule." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)). "The key inquiry is instead '**whether the employer made a reasonably informed and considered decision before taking an adverse employment action**.'" *Id.* (quoting *Seeger*, 681 F.3d at 285).

*Immormino v. Lake Hosp. Sys., Inc.*, No. 1:13-CV-1818, 127 F.Supp.3d 829, 837 (N.D. Ohio 2015) (emphasis added). There is no evidence in the record that Defendants relied on particularized facts in arriving at their decision to terminate Shields's employment. Nor is there evidence that Defendants

25

conducted any sort of pre-termination investigation or made a "reasonably informed and considered decision." *Id.* Defendants are not entitled to rely on the honest belief rule when Bruschi's suggestion was based solely on "just" his and Armstrong's (unverified) "feeling" that they could "do without" Shields.[6] (Doc. No. 30-1, PageID# 446.)

Further, Defendants' reclassification of Williams's job title immediately prior to Shields's termination and their subsequent assertions early in this case that Williams was an Industry Specialist, not a Corporate Account Manager, supports Shields's pretext argument. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) (citing *Edwards v. U.S. Postal Service*, 909 F.2d 320, 324 (8th Cir.1990); *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 132–33 (2d Cir.1987)). Like in *Thurman*, Defendants changed their "factual position as the litigation continued" regarding Williams's status as an "Industry Specialist." *Id.* As discussed at length above, Williams was never an Industry Specialist and never possessed any expertise in the tire industry, yet Williams's job title was changed to "Industry Specialist" on April 1, 2020—the same day that Bruschi recommended Shields for layoff. (Doc. No. 30-3, PageID# 540.) Williams's job title is relevant because Williams's classification as "Industry Specialist"—a different job than Shields's role—would likely have foreclosed Shields from arguing that he was laid off and a younger, less-qualified employee *in the same role* was retained. *See supra.* The Court is not persuaded by Defendants' argument that none

---

[6] Moreover, the record indicates that McCambridge had no personal knowledge to assert that Armstrong felt that Shields brought "no val[u]e." (Doc. No. 30-1, PageID# 528.) In his April 2, 2020 email to Lundgren, McCambridge asserted that "**Dave Armstrong** and Dewayne both feel Mike brings no val[u]e . . . ." (*Id.*, emphasis added.) However, Bruschi already told McCambridge that he had "**not talked to Dave specifically about**" terminating Shields's employment. (*Id.* at PageID# 446, emphasis added.) Further, when asked if he had any conversations with McCambridge about whether Shields brought value to SMC, Armstrong admitted that he had "none whatsoever." (Doc. No. 28-6, PageID# 261.) Despite knowing that Bruschi *did not speak to Armstrong about terminating Shields*, McCambridge did nothing to verify that Armstrong indeed felt that Shields brought "no val[u]e" but represented Armstrong as having such a stance anyway.

of Shields's cases on shifting factual positions are applicable because SMC never changed its explanation for selecting Shields for layoff.  (Doc. No. 32, PageID# 755.)  Shortly after Bruschi suggested Shields for layoff, Defendants changed Williams's position to "Industry Specialist"—presumably to obfuscate the obvious comparison between Shields, the older, more qualified Corporate Account Manager who was laid off, and Williams, the younger, less qualified Corporate Account Manager who was retained, in an age discrimination lawsuit.  For more than a year, Defendants plainly attempted to hide a fact that is crucial to Shields's ability to establish his case.  Accordingly, the Court concludes that Defendants' efforts to hide the fact that Williams was a Corporate Account Manager also supports Shields's pretext argument.

In reaching this conclusion on pretext, the Court is mindful of the Sixth Circuit's observation that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?"  *Chen*, 580 F.3d at 400 n.4.  It can be useful to "distill the [pretext] inquiry into a number of component parts," but "that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination."  *Id.*  Here, there is no evidence that Defendants conducted any pre-termination investigation into Shields's performance or engaged in even the briefest comparative analysis of Shields's performance to that of other Corporate Account Managers.  There is further evidence that Defendants switched Williams's job title the same day that Bruschi suggested that Defendants terminate Shields's employment, and that Defendants proceeded to assert that Williams was an Industry Specialist, not a Corporate Account Manager, for well over a year.  Finally, there is evidence that Defendants only conducted an analysis of Shields's performance several weeks after Shields notified Defendants that he planned to bring an age discrimination lawsuit against them.  This evidence, taken together, leads to the commonsense

27

conclusion that Defendants did *not* fire Shields for the stated reason Defendants proffered in their Motion and attempted to obfuscate facts that potentially indicate that Defendants impermissibly selected Shields, rather than Williams, based on Shields's age. *Id.* Accordingly, the Court concludes that Defendants' proffered reason for Shields's termination was pretextual. Defendants are not entitled to summary judgment on Shields's age discrimination claims against SMC.

### C.    Shields's Individual Claims Against Lundgren

Shields brings both his ADEA claim and related state-law age discrimination claim against Lundgren, Shields's direct supervisor at the time of Shields's termination. Supervisors cannot be held personally liable for age discrimination under the ADEA. *Bailey v. East Liverpool City Hosp.*, No. 4:14-cv-2809, 2015 WL 5102768, at *3 (N.D. Ohio Aug. 31, 2015) (citing *Wathen v. Gen Elec. Co.*, 115 F.3d 400, 404 n.6 (6th Cir. 1997)). Thus, the Court grants Defendants' Motion on Shields's ADEA claim against Lundgren because such a claim fails as a matter of law.

However, a plaintiff may pursue a claim of individual liability for age discrimination against a supervisor under Ohio Rev. Code § 4112.02. *Brown v. Tellermate Holdings Ltd.*, No. 2:11-cv-1122, 2015 WL 5047981, at *12 (S.D. Ohio Aug. 27, 2015) (citing *Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 787-88 (Ohio 1999)). Under Ohio Rev. Code § 4112, a "supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager." *Genaro*, 703 N.E.2d at 787-88.

In *Brown v. Tellermate Holdings, Ltd.*, the plaintiffs brought individual age discrimination claims under Ohio Rev. C. § 4112 against several individuals. *Brown*, 2015 WL 5047981, at *1. Two of these individuals included David Lunn, the supervisor who oversaw the plaintiffs and who recommended that the plaintiffs be laid off in the reduction-in-force, and Paul Rendell, Lunn's

28

supervisor who approved Lunn's decision to terminate the plaintiffs' employment.  *Id.* at *7, *12. The district court concluded that there was a genuine issue of material fact as to whether both Lunn *and* Rendell engaged in discriminatory conduct that would subject them to liability under Ohio Rev. C. § 4112, even though Lunn recommended the plaintiffs for termination and Rendell merely approved Lunn's decision.  *Id.* at *12.

On the record before the Court, there is a genuine issue of material fact as to whether Lundgren engaged in discriminatory conduct that would subject him to liability under Ohio Rev. Code § 4112. *See, e.g., Brown*, 2015 WL 5047981 at *12.  Like Defendant Rendell in *Brown*, Lundgren accepted Bruschi's recommendation that Shields be included in the reduction-in-force and proceeded to terminate Shields's employment.  Lundgren admitted to McCambridge on April 2, 2020 that he did not have enough information about Shields's performance to recommend him for termination.  (Doc. No. 30-8, PageID# 700.)  Moreover, Bruschi wrote in his email to McCambridge that Shields did not report to him anymore and offered no informed analysis or rationale for terminating Shields's employment, beyond his own "feeling."  (Doc. No. 30-1, PageID# 446.)  Even though Lundgren *was* Shields's direct supervisor and presumably had access to Shields's most recent performance review (unlike Bruschi), Lundgren accepted Bruschi's suggestion without question and terminated Shields's employment.  Considering these facts, along with the reasons articulated above regarding Shields's *prima facie* case and Defendants' pretextual reason for terminating Shields's employment, the Court concludes that there is a genuine issue of material fact as to whether Lundgren himself engaged in discriminatory conduct that would subject him to liability under Ohio Rev. Code § 4112.

## IV.     Conclusion

For all the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 28) is granted in part and denied in part.

**IT IS SO ORDERED.**


                                        _s/Pamela A. Barker_____
                                        PAMELA A. BARKER
Date: May 13, 2022                       U. S. DISTRICT JUDGE